UNITED STATES *v.* WINOGRAD BROS., INC. (No. 4451)[1]

United States Court of Customs and Patent Appeals, March 2, 1945

Paul P. Rao, Assistant Attorney General (*Richard F. Weeks, Alfred A. Taylor,*
Jr., and *Sybil Phillips,* special attorneys, of counsel), for the United States.
Barnes, Richardson & Colburn (*Albert MacC. Barnes, Samuel M. Richardson,* and
Hadley S. King, of counsel) for appellee.

[1] C. A. D. 302.

[Oral argument October 3, 1944, by Mr. Rao and Mr. Barnes]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

We have here an appeal on the part of the Government from the judgment of the United States Customs Court (First Division), Walker, J., dissenting, sustaining the protest of the importer—appellee here—against the classification of and duty assessment upon goatskins imported from China in July 1938, and entered at the port of New York City.

The Collector of Customs classified the merchandise as "dressed fur skins" dutiable under paragraph 1519 (a) of the Tariff Act of 1930, and collected duty at the rate of 25 per centum ad valorem. We quote the complete text of the paragraph:

PAR. 1519 (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; all the foregoing, if dyed, 30 per centum ad valorem.

The protest of appellee reads in part as follows:

We claim that said merchandise is properly dutiable at 20% under Par. 1558 or at 10% under Par. 1558 or is free of duty under Par. 1681 of the Tariff Act of 1930.

Paragraphs 1558 and 1681 read:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1681. Furs and fur skins, not specially provided for, undressed.

At the trial below appellee seems to have relied wholly upon the claim for free entry under paragraph 1681 which the majority of the trial court sustained.

In the appeal to us the Government primarily contends that the collector's classification should be sustained and the judgment reversed *in toto*, but alternatively alleges (we quote from its brief):

The merchandise, if not dressed, is partly dressed and manufactured in whole or in part, and accordingly dutiable at 20 per centum under paragraph 1558.

This alternative claim is duly presented by one of the errors assigned by the Government. It was considered and passed upon by the trial court which stated in the majority opinion:

The provision "Dressed furs and dressed fur skins" is a specific enumeration. Likewise the provision for "Furs and fur skins * * * undressed" is a specific enumeration. Certainly "Dressed furs and dressed fur skins" and "Furs and fur skins, * * * undressed" are more specific than either the provision for "raw or unmanufactured articles," or "articles manufactured, in whole or in part." There is, therefore, no place for the application of either provision of paragraph 1558 to the merchandise involved in this case, and we need give no further consideration to the provisions of said paragraph.

We find nothing in the dissenting opinion of Judge Walker which

indicates any disagreement with that holding, or with the further statement in the majority opinion to the effect that the sole question presented for determination before that tribunal was whether the involved goatskins, in their imported condition, were dressed or undressed. Upon the record presented, the majority held that in the condition as imported they were undressed within the meaning of paragraph 1681 and, therefore, entitled to free entry, while Judge Walker was of the opinion that they were dressed within the meaning of paragraph 1519 (a), and that the collector's classification should have been sustained.

We think it proper to dispose of the questions relating to paragraph 1558 at this point by stating that we are in agreement with what appears to have been the unanimous view of the trial court with respect to the nonapplicability of that paragraph to the merchandise. The arguments on behalf of the Government respecting this phase of the case have been fully considered and the authorities cited have been examined, but we are not convinced that there was error in that regard on the part of the trial tribunal.

We think the basic issue to be determined is whether the goatskins were dressed or undressed, and so proceed to its consideration.

As is stated in the Government's brief the record in the case is unusually long, and much of the evidence is technical in character. It was very fully reviewed in both the opinions below, and, obviously, was carefully weighed by the judges before whom the testimony was taken. We have spent much time in studying the extensive record, but, in view of the conclusion we have reached, we deem it unnecessary to set forth in this opinion a review of all the evidence in minute detail.

Issues analogous to the basic issue here involved have been before us in the cases of *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902, and *United States* v. *Arnhold & Co., Inc., et al.*, 27 C. C. P. A. (Customs) 135, C. A. D. 74. The merchandise involved in those cases consisted of dogskins, and in each instance it was held to be classifiable under paragraph 1681, *supra*, and therefore free of duty.

It may be said that the record in the last-named case, like the record here, was a voluminous one, and that certain of the witnesses called by the importer in that case were also called in the instant case. It may be further said that the ultimate use of the goatskins at issue is shown to be substantially the same as that of the dogskins involved in those cases. After importation both were sold to fur manufacturers, or to dealers who in turn sold to manufacturers, subjected to various processes, and eventually made into a variety of fur articles, principally trimmings, such as collars and cuffs for ladies' cloaks and coats.

It is elementary, of course, that in passing upon the question at issue, the merchandise, which is represented by a sample introduced

in evidence as Exhibit 1, must be considered in its condition as imported. It is, therefore, necessary to consider first the processes to which the skins were subjected in China. Concerning this, two witnesses (Leon Goorevich and Marcus Silverberg) were called by the importer, and one (Martin R. Nicholson) by the Government. In the majority opinion of the trial court it is said:

\* \* \* In view of the fact that the testimony of the three witnesses concerning said process is basically the same, we shall give only the process as testified to by witness Goorevich. While it is true that the process detailed by witness Nicholson is somewhat more elaborate than the process described by the other witnesses, yet, as heretofore stated, this process, as described by the three witnesses, is basically the same.

The substance of the testimony of Goorevich is then recited as follows:

When the bales of skins were received they were opened up and the skins dried in the sun; they are then put in a pool of fresh cold water, where they are soaked until they become soft, three or four, and sometimes eight hours. They are then washed in this water, after which they are taken out and scraped, the skins are "fleshed." Fleshing consists in taking off the fat, meat, dirt, and blood. After this they are placed in an earthenware kong holding 30 or 35 gallons of water, to which has been added about 20 pounds of dirty sea salt, and to this was added about 40 pounds of Gaolin flour, being made from seed the same or similar to those in evidence in *Brachman* v. *United States*, C. D. 389, and in *United States* v. *Rotberg*, 24 C. C. P. A. 441. The water, salt, and flour are then mixed up together and about forty-five of the fleshed skins are placed in each kong, where they remain for six or seven days, at the end of which time they are lifted up and turned over, and then remain for another three or four days; they are then taken from the kongs and placed in the sun to dry; after they are dry they are dampened with water blown from the mouth, then scraped with an iron and beaten for fifteen or twenty minutes with a bamboo stick to remove part of the flour. They are then packed in bales of 100 skins and are ready for shipment.

On direct examination this witness several times referred to the place where these goatskins were subjected to this processing as a tannery, and on cross-examination he frankly testified as follows:

X Q. Now, isn't it a fact, too, that these places where these skins are prepared are called tanneries?—A. Yes.

X Q. Or dressing plants?—A. Tanneries.

X Q. When you bought raw goatskins, didn't you tell your Chinese foreman to tan them?—A. Yes, sir.

X Q. And when they were tanned were they in this condition, of Exhibit 1? —A. After tanning ——

X Q. When the foreman got finished with the process?—A. Yes.

Referring to the "tanning" set out above, the witness testified that "It is Chinese tanning." The witness also stated there were about 100 tanneries in Suanhwafu, all of which he had visited and in all of which he had witnessed or observed the processing of goatskins. He further testified that Suanhwafu and Chin Chow were the principal processing centers for goatskins during his experience, which covered the period from 1929 to 1939. This testimony 's nowhere contradicted by any one. This witness further testified that there were no processing plants in Tientsin for goatskins, that he had been in the processing plants in that city and that no goatskins were being processed there between 1935 and 1938.

The testimony of Silverberg relative to the operations which he witnessed was substantially the same as that of Goorevich.

It appears that both Goorevich (who was born and educated in China) and Silverberg (who lived in China for many years) had long experience in buying, selling, and exporting merchandise of the kind here involved, operating in China. It further appears that both had personal experience in the actual processing of such merchandise in China, their processing operations being carried on in Suanhwafu. It is obvious that these witnesses were thoroughly qualified by training and experience to describe the Chinese processing operations which were applied, but for reasons hereinafter appearing we also set forth the material parts of the testimony of the Government's witness, Nicholson.

It appears that this witness [was for 16 years an examiner of merchandise in the United States Appraisers Stores at San Francisco, Calif., in which capacity he examined "All lines of merchandise imported from China and Japan." Later he became a Treasury attaché with headquarters at Shanghai, China, and at the time of testifying in this case in April 1941, had been stationed there for 24 years. As such attaché his duties were to make investigations of matters pertaining to customs, smuggling, narcotics, and other special work assigned him under the direction of the Secretary of the Treasury. In connection with his duties he came in contact with the fur industry in China during a period of some 20 years.

In 1938, the year of the importation here involved, he received instructions to make an investigation of the processing of goatskins, and went to Tientsin where he made the observations concerning which he testified.

While he is not shown to have actually had any personal experience in the industry, such as that of the importer's witnesses, we see no reason to question his qualifications to state what he actually saw done, and we here quote the epitomization of his testimony (omitting references to the record pages) stated in the brief on behalf of the Government before us:

(1) goatskins are thoroughly beaten with bamboo sticks;

(2) put in a bath of clear water for two hours;

(3) placed in a kong containing a solution of so-called saltpeter and water for 12 hours;

(4) thereafter the skins were allowed to drain;

(5) fleshed to remove grease and fat;

(6) Chinese tanners added millet flour to the solution of so-called saltpeter and salt and the solution was thoroughly stirred;

(7) the fleshed goatskins were placed in the solution and 10 gallons of the solution were taken from each kong and heated to a boiling point;

(8) the goatskins remained in this solution for five days and every day an increasing amount of solution (12½ gallons more per day) was taken from each kong and heated to a boiling point. During the processing Nicholson took daily

temperature readings and ascertained that the temperature of the solutions rose to a high point of 110° F;

(9) on the sixth day the Chinese tanners examined the skins by stretching the pelt;

(10) the skins are then dried in the sun; when dried, workmen mouth sprayed the pelt side with water;

(11) thereafter the skins were scraped with a sharper shoulder knife;

(12) they were then placed in electrically operated drums;

(13) they were staked with a hand and foot knife like Exhibit 28, which smoothed the skins;

(14) the hair was then beaten with bamboo sticks and the process was considered finished.

While, as was stated in effect by the majority of the trial court, Nicholson's description of the process is somewhat more detailed than that given by Goorevich and Silverberg, we fail to find any step recited by him and not mentioned by them from which it may be deduced that the *condition of the merchandise* at the conclusion of the processing which he witnessed differed from the condition of that which they described.

So much for the processes carried out in China.

It is the theory of the Government, that in the condition imported, the skins were dressed, and that the processes applied after importation were for purposes other than dressing—principally (as to some of the skins) bleaching, and (as to others) dyeing. Appellee on the other hand contends that the processing operations in the United States were essential to render them dressed fur skins suitable for use in manufacturing the ultimate articles described, they not being fit for such in their imported condition.

A very elaborate record, consisting of the testimony of many witnesses called on behalf of the respective parties, and numerous physical exhibits, was made up concerning the processes to which goatskins are subjected after being imported into the United States, and as to some phases of this matter there are irreconcilable differences in the testimony. This is particularly true with respect to the *opinions* of different witnesses as to *the purpose and the effect* of such operations.

The situation thus depicted is in many respects similar to that which confronted the courts in the *Arnhold & Co., Inc.* case, *supra*. There as here there were sharp conflicts in the testimony, particularly the testimony of the scientists and experts who were called as witnesses relative to the processing operations carried out after the importation of the dogskins there involved. Of this we took note in the following statement:

The testimony of the scientists testifying on behalf of appellant and those testifying on behalf of appellee is irreconcilable. * * *

We think it proper also to direct attention to the fact that in that case as in this there was a dissenting opinion by a judge of the trial court. His dissent, however, was not predicated upon any opinion

that the dogskins in their imported condition were "dressed fur skins" within the meaning of paragraph 1519 (a), *supra* (he agreeing with the majority that they were not), but upon the opinion that what was done to them in China rendered them subject to the provision in paragraph 1558, *supra*, for "articles manufactured in whole or in part, not specially provided for."

We did not there regard paragraph 1558 applicable, and we affirmed the judgment rendered by the majority, applying the historic rule that the findings of fact by a trial court will not be reversed by an appellate court unless such findings are deemed to be clearly contrary to the weight of the evidence. We there said, *inter alia:*

> No useful purpose would be served in analyzing in this opinion in detail the voluminous testimony found in the record upon the question here involved. It is sufficient to say that it was the province of the trial court to weigh the conflicting evidence. This it seems to have done with great care, and both the majority and dissenting opinions review the evidence at great length.
>
> It is so well established as to require no citation of authority that judgments of the Customs Court in protest cases based upon facts found by it will not be reversed unless found by us to be clearly contrary to the weight of the evidence.
>
> Moreover, regard must be had of the fact that the judges of the trial court had opportunities for observing the witnesses which this court does not have. Having heard the witnesses testify, the trial court could form a better judgment of the character of the testimony and the credibility of the witnesses than can this court. *Callbeck* v. *United States*, 21 C. C. P. A. (Customs) 1, T. D. 46318.
>
> Upon careful consideration of the testimony, we cannot hold that the finding of the trial court that the involved dogskins are undressed is clearly contrary to the weight of the evidence.

The foregoing is as applicable here, upon the record on which this case was originally tried and decided below, as it was there, and there exists no necessity for our reviewing that factual record, except to the extent required in passing upon an assignment of error by the Government relating to a motion for rehearing, to which we now turn.

On December 12, 1942, Mr. Paul P. Rao, Assistant Attorney General, Division of Customs, filed application "for an order to vacate and set aside the judgment herein rendered November 25, 1942, and further ordering a rehearing herein."

Certain proceedings prior to the making of the motion, and certain of those had subsequent thereto, were unusual in character, and it is proper to relate something of their history.

Among the witnesses called on behalf of the importer in this case were Leon Goorevich, Marcus Silverberg, Abraham Goodman, Emil Olson, and Irving Becher.

The testimony of Goorevich and Silverberg related solely to the processing operations in China, and has been already referred to above.

Goodman appears to have been a manufacturer of cuffs, collars, etc., for the cloak and suit trade (not a processor of furs), and his

testimony related primarily to his business as conducted · in the United States. In answer to questions he expressed the opinion that Exhibit 1 was undressed, and stated, in effect, that he could not use it in its condition as imported in his business.

Olson and Becher appear to have been engaged, each for many years, in fur tanning and fur dyeing in the United States, and their testimony relates in the main to their processing methods in dressing, tanning, and dyeing skins, including goatskins.

In both the majority and dissenting opinions of the trial court the testimony of the witnesses named was recited (most of it in considerable detail), and commented upon along with that of many other manufacturers and processors.

The motion for rehearing was based principally upon an affidavit of Mr. Rao (to which other affidavits hereinafter more particularly described were annexed) in which (after an introductory paragraph) it was said:

* * * On November 25, 1942, judgment was entered in favor of the plaintiff, sustaining the protest and adjudicating that the said furskins were undressed and entitled to free entry as such. Said judgment was rendered upon a decision of this Court bearing even date therewith, one judge dissenting therefrom.

Deponent's office has collaborated with the office of the United States Attorney for the Southern District of New York and with Treasury Agents in connection with a certain investigation that was being conducted in reference to the testimony of certain witnesses who appeared in this case and in *Brachman & Co.* v. *United States*, Protest 626874–G, and *Arnhold & Co.* v. *United States*, Protest 621404–G, involving dogskins imported from China, and turning on the same issue of law. I am informed the Government has been obliged to refund approximately $4,375,000 because of the testimony given by these same witnesses in other cases before this Court. Deponent's office, in collaboration with the United States Attorney and Treasury Agents, caused certain of the witnesses who testified for the plaintiff herein to be interviewed and interrogated, and the annexed affidavits of Emil Olson, Irving Becher, Leon Goorevich, and Abraham Goodman have been obtained which show beyond doubt that the testimony given at the trial was false and untrue. In addition thereto, an affidavit of Marcus Silverberg, entitled "In the United States District Court, Southern District of New York, *In the Matter of United States of America* v. *John Doe*," has also been obtained and is hereto annexed.

Deponent now moves upon these affidavits, and the annexed affidavit of Richard F. Weeks, and under Sec. 518 of the Tariff Act of 1930 and Rule 9 of the Rules of the United States Customs Court, for an order setting aside the said judgment rendered herein and granting a rehearing for all purposes, upon the facts set forth in said affidavits, which show that certain of the testimony adduced on behalf of the plaintiff herein is false, untrue, confusing, and misleading, and that plaintiff's witnesses perpetrated a fraud on the Court and on the Government of the United States.

Mr. Richard F. Weeks, referred to in the foregoing affidavit, is a United States special attorney in the office of the Assistant Attorney General. His affidavit has reference to certain matters respecting another witness, which matters we think may be disregarded in the

discussion of the motion for rehearing, since the controversy concerning this witness was practically abandoned in later proceedings.

The other affidavits filed with the motion, were those of Goorevich, Silverberg, Goodman, Olson, and Becher. That of Silverberg appears to have been executed August 25, 1942. All the others were executed during November 1942, on dates ranging from November 9, 1942, to November 19, 1942.

It will be observed that the affidavit of Mr. Rao does not state just when the collaboration between his office, the office of the United States District Attorney, and the Treasury agents in making the investigation referred to began, but from proceedings had before the trial court hereinafter described, it appears that it began several months prior to November 1942, and continued over a considerable period of time. The precise purpose for which the investigation was conducted is nowhere stated in the record.

After the motion for rehearing had been filed, proceedings (unnecessary to be recited in detail) were had which resulted in the trial court determining to call the several witnesses before it for oral examination upon oath. An order to this effect was duly entered and subpoenas were issued for them.

The proceedings under the order began on January 26, 1943, and apparently continued through January 28, 1943. All the witnesses summoned appeared and testified, and their testimony, together with exhibits, constitutes a printed record of some 260 pages.

Counsel for the Government were permitted by the court to question the witnesses in the first instance, and thereafter counsel for the importer examined them, members of the court frequently interposing questions.

The examination was marked by numerous controversies between counsel relative to the admission of answers to questions propounded, and many rulings by the court were required. As to some of such rulings the court was not unanimous and the issue was determined by a majority. So, the record upon that phase of the controversy is greatly complicated and has been difficult of analysis.

In a general way it may be stated that it appears that the several witnesses were in some manner summoned to go to a room in the Federal building in New York City, where they were confronted sometimes, but not always, by a representative of the United States District Attorney's office, and always by Treasury agents, and by them interviewed, particularly by the latter. Each of the witnesses was called many times for interview or examination. According to a statement in the record, the witness Silverberg's first visit was about the middle of August 1941, but we apprehend this may be a typographical error, inasmuch as the only subpoena for him (appearing in the record as Exhibit P–1) is dated August 17, 1942. The date, how-

ever, is of no particular importance. He did appear in August 1942, and many times thereafter. The first appearances of the other witnesses seem to have been in August 1942, and, as indicated, each of them appeared several times thereafter.

No serious effort was made at the hearing before the Customs Court to bring out all that was said and done at all the many interviews between the witnesses and the Government officials. We deduce from the record that at many of such interviews, no stenographic records were kept. At certain of them, however, stenographic notes were made and transcribed, and these transcriptions appear in the printed record as exhibits, in the form of questions and answers. Exhibit 3–P is the statement of Goodman; Exhibit 4–P (consisting of several parts bearing different dates) is the statement of Goorevich; Exhibit 5–P (also in parts) is the statement of Olson, and Exhibit 6–P (likewise in parts) is the statement of Becher. No statement by Silverberg made before the Treasury agents in question and answer form appears of record.

The foregoing is, of course, intended only to state a mere outline of the record presented before the trial court on the motion for rehearing.

The decision of the court on the motion was announced April 23, 1943, as follows (omitting the caption):

Upon reading the motion of the Assistant Attorney General for a rehearing herein, together with the attached supporting papers, and the memorandum filed by counsel for the plaintiff requesting that certain witnesses be recalled for further examination regarding the matters set out in the moving papers, and having heard the additional testimony given by said witnesses at a hearing had upon said motion, and after due and careful examination and consideration of all the moving papers and the additional evidence adduced in support of said motion for rehearing, together with the briefs submitted by counsel for the respective parties,

It is hereby ordered, adjudged, and decreed that said motion for rehearing in this case be, and the same is hereby denied.

Dated New York, N. Y., April 23, 1943.

WILLIAM J. TILSON,

D. H. KINCHELOE,

*Judges of the United States Customs Court.*

I hereby dissent from the above and foregoing order.

THOMAS J. WALKER, *Judge.*

In view of the unusual circumstances attending the proceedings relating to the motion for rehearing, we think it would have been entirely appropriate and probably helpful, at least to this court, had the majority of the trial court seen fit to express in writing its reasons for denying the motion, but, of course, it was not mandatory upon it to do so, and we are not called upon to speculate as to what its reasons may have been.

We think it not only proper but important, however, to point out that there was no claim on the part of the Government of any newly discovered evidence. The statements made by the witnesses before the Treasury agents, insofar as we can determine, do not indicate

that those officials confronted the witnesses with anything new, but the general tenor of the questions indicate an effort to secure from the witnesses statements contradictory of, or out of harmony with, certain of the statements they had made in their testimony given at the trial.' To put it more bluntly, they seem to have sought in a measure to get the witnesses to impeach themselves, and, in effect, admit misstatements possibly amounting to perjury.

Incidentally, it may be said that we find no questions propounded by the Treasury agents which might not have been propounded, if properly formulated, by Government counsel in the cross-examination of the witnesses during the original trial of this case before the Customs Court.

The Customs Court, of course, had the right to look to the evidence of the involved witnesses given before it at trial of the case on the merits. There was nothing then to cast suspicion on them and we state very frankly that, from our examination of the record made after the judgment had been rendered, we are not convinced that such discrepancies as appear are of sufficient materiality to require that their original testimony be now rejected as "false, untrue, confusing, and misleading."

Furthermore, it must not be forgotten that the majority decision was not by any means predicated solely upon the testimony of the witnesses now under attack. Their decision, we think, clearly shows this to be the case.

So far as the processing operations in China were concerned, the testimony of the Government's own witness was looked to, as well as that of Goorevich and Silverberg. There was also an abundance of testimony other than that of Olson and Becher respecting the processing operations in the United States (much of it by witnesses called on behalf of the Government), which was not, in our opinion, materially inharmonious with the processes Olson and Becher described.

The witness Goodman was not a processor, but a manufacturer. He may not have been qualified to testify *as a scientist* on the question of whether a skin was dressed or undressed, but he certainly was qualified to state, as he did state, in effect, that he could not use Exhibit 1 in its imported condition to make collars and cuffs for coats and cloaks, and there was no modification of this statement in his subsequent interview with the Treasury agents. There is other and practically uncontradicted evidence to the same effect.

.We do not feel it incumbent upon us to go further into the factual phases of the case.

In the final analysis, the question as to the motion for a rehearing is whether its denial by the majority of the trial court constituted an abuse of judicial discretion.

Under the circumstances of this case we think it must be assumed

that if the testimony presented on the motion had been before the court at the time of its original decision, it would not have changed the opinion of the majority, and that the factual situation upon which the original majority opinion was based had not, in its view, been so altered by the testimony presented on the motion as to justify a different conclusion.

It must be remembered that it was as much the function of the trial court to weigh the evidence on the motion as it was to weigh the evidence in reaching its conclusion originally. It states that it performed that function and certainly there is no reason to doubt it.

We can find no justification whatsoever for holding that the denial of the motion to vacate the judgment and grant a rehearing constituted an abuse of judicial discretion.

There are a number of allegations of error relating to the admission, in some instances, and the exclusion, in other instances, of certain testimony and exhibits. These have been examined and considered, but are not believed to have merit.

The judgment of the Customs Court is *affirmed*.